May it please the Court, Scott Hunt appearing on behalf of Plaintiff Appellant Cindy Scheinberg. In this multiple discrimination and defamation action, I'd like to address the claims in three stages. First, the defamation claim based upon the statement by Mr. Eckholt that Plaintiff and Ms. Smith had both expensed the same dinners and breakfasts or the same meals, because that's the simplest claim. Then I'd like to turn to the various discrimination claims based on sex, national origin, and race, where I want to focus on the evidence of discriminatory animus in the record as opposed to the pre- or rather, in particular, as opposed to pretext. And then I'd like to return to the defamation claim based upon the statement made in reference to Plaintiff that, again by Mr. Eckholt, quote, this is clear expense report falsification. And in that second defamation claim, I hope to focus the Court's attention on the evidence regarding abuse of privilege. Initially, regarding the defamation statement that Plaintiff and Ms. Smith expensed the same meals, the evidence is that before Mr. Eckholt made that statement to Mr. Myklosky, he had Mr. Lawrence conduct an audit of Ms. Scheinberg's expense reports, ostensibly to determine if there was a pattern. Mr. Lawrence's audit determined that there were, in fact, no duplicate charges for the same meal, although there were multiple meals charged on the same day, and some of those meals were miscoded so that there may be more than one lunch charged. Mr. Lawrence's audit determined by looking at the individual receipts that, indeed, there were no duplicate charges by Plaintiff and Ms. Smith, and most significantly as to the abuse of the privilege as it relates to that statement. The evidence is at ER 139 in Lawrence's deposition testimony that Mr. Lawrence told Mr. Eckholt of that result. Mr. Lawrence stated in his deposition that he didn't find, he checked for duplicate receipts and didn't find any, and he told Mr. Eckholt that fact. So as to that first defamation claim, there is evidence in the record to establish that there was no reasonable grounds to believe the truth of the statement Mr. Eckholt made that Plaintiff and Ms. Smith had expensed duplicate meals. Now, again, that's the simplest one. I think that's real straightforward. I'd like to move to the discrimination cases because I think those cases are tied in with the second defamation claim, where Eckholt tells McCloskey that my client had falsified or expense report falsification, had committed clear expense report falsification. There's a case regarding discrimination. There's a new case recited to the court, Esca v. Cisco Food Service. It follows this court's, it's a Ninth Circuit case. It follows this court's ruling in Mostafa regarding what type of comments by a decision maker are sufficient evidence of discriminatory animus such that in a discrimination case, summary judgment should be denied. And the standard in both those cases goes to whether somebody in authority made comments that demonstrated discriminatory animus. In the most recent case, the Fancesca v. Cisco Food System, the additional authority recited, in that most recent case involving a Hispanic warehouse worker, the court found that the supervisor who had mocked the warehouseman's accent and pretended not to understand the Hispanic when he tried to explain a problem with the computer system, that that negative derisive reaction, that ridicule, was sufficient evidence to survive summary judgment, in part because it's a decision maker, in part because of the proximity to the decision. But note it wasn't necessarily involved with the decision itself. And if we look at the evidence in this record, there is several, multiple examples of discriminatory comments or conduct that demonstrate a discriminatory animus. And it's significant. I'm sorry? Before you get to that issue, in order to establish a prima facie case, don't you have to establish that the plaintiff's performance was satisfactory to the employer? Yes. You have to. Part of the prima facie case is that they were qualified. How do you deal with that issue in this case? Well, I would turn the court's attention to the statement by Mr. Eckholt regarding the March meeting in Germany. Let me get the excerpts of that. The trial court and the defense make a great deal of all the complaints going back to 2000. The trial court and defense tried to negate the positive performance review that plaintiff received in December of 2001, four months before she was terminated. That's not the whole story, right? That performance review is not the whole story. Certainly not. But it certainly goes to negating the prior complaints as a basis for the very minimal standard that's required for a prima facie case. What about the subsequent complaints? Well, the subsequent complaints, and in particular, the defendant focuses on the February presentation, where my client didn't have the person show up with the PowerPoint presentation and sort of had to ad lib her presentation and admitted that she didn't do a very good job. They tried to make a big point that that February comes after the evaluation. So there are these additional factors. Well, I draw the court's attention to page 118 in the excerpts of the record. And in page 118 is Mr. Eckholtz, the human resource manager's deposition testimony regarding the March meeting after the February presentation. And in the March meeting as of March 20th, on page 17, Mr. Eckholtz says, we decided that we wanted to keep her in the department. He goes on, we wanted to make sure she stayed there because she had some experience with the department. She knew pretty well about the Adidas Americas International, and she had a good understanding. And we definitely didn't want to replace her. Now, that's as of March, Your Honor, and that's after the February incidents. It's after any post-complaints following the December evaluation. And it's only three and a half weeks before she's ultimately terminated. And the testimony is that the only thing that happens next regarding her employment from Mr. Eckholtz is the expense report issue. I thought that there was a long litany of complaints that preceded her, that represented an e-mail that preceded her firing and the decision to fire. A long litany is an inaccurate description of it. But there are complaints dating back to 2000 when she initially takes over the- No, I'm talking about September 2002. I think you're referring to the December e-mail from Mr. Bennett. September, wasn't it? You've got me confused with the date. 2002 is-  September 2002. Well, go ahead. The e-mail that I believe is in the record that I believe you're referring to is a December e-mail from Mr. Bennett, that both the court and defendant inaccurately characterized as a warning. Mr. Bennett doesn't characterize it as a warning, and the e-mail doesn't state it's a warning. And significantly, the e-mail does not refer to expense report personal, rather, personal expense report errors. There are discussions in the past about total expenditures. There are discussions about the expense of certain samples. But the previous e-mails and discussions that my client had with various members of management was not about personal expense reports. And that's one of the errors, that's one of the basis to refute the-jumping a little ahead to the defamation claim, is that there is no pattern of falsification. There is issues of errors not attaching receipts, but they commonly weren't available. One other-let me make one thing clear on the February presentation thing, the February presentation being a factor as to poor performance. McCloskey states the February presentation was not a factor in the determination. So between McCloskey's statement and the statement by Eckholt that as of March, they definitely wanted to keep her in her position, as to the very minimal standard required to the prima facie case, there is evidence here that she was satisfactorily performing her performance up to the time of the issue of the falsification of the expense reports. That issue takes us to-well, I will not repeat all the evidence of discriminatory animus, but I think it's important to draw the court's attention to it. It's set out on pages 24 to 24-22 to 24 of the opening brief, excuse me. It has evidence regarding different treatment of German nationals. It has evidence favoring German males. It has evidence of a lack of support for American female managers compared to German male managers. That evidence is supplied not only by Camilla Natel, it's also supplied by Plaintiff herself. There is evidence of Mr. McCloskey being disrespectful, ignoring the female managers to the point of not giving them support. When he's told to be at a meeting that they need him to be at, he goes out of his way not to be there and brushes off Ms. Natel. He's disrespectful toward them. He generally promotes Germans. I think as to the Mustafa and the Fosenica standards, as to that evidence of discriminatory animus, there are statements regarding the U.S. design team in general designs crap, statements that you Americans have such bad taste, statements referring to Plaintiff as a Jewish princess, that goes both to race and sex, as well as referring to Plaintiff as princess. Those comments are repeated a number of times, over 20 times each. All of those, the importance of that is that the courts sometimes, based on the Godwin standard, get confused as to what used to be considered direct evidence and circumstantial evidence. And if you have a little direct evidence, that's enough. But if you only have circumstantial evidence, it needs to be substantial. I think the Ninth Circuit has recognized the Supreme Court has made it clear that there shouldn't be that distinction. The defense cited that case to you. There shouldn't be a distinction between direct evidence and circumstantial evidence. And the case that the defense cited to you as supplemental authority makes it clear that that distinction shouldn't exist, but it continues to impose the substantial evidence requirement regarding pretext. Prior to Ms. Sheinberg's termination, had she ever raised any complaints regarding discriminatory treatment? Yes. And that's part of our argument, that Echols' defamation is for an improper purpose. The evidence is that Ms. Sheinberg goes to Echols shortly before she's terminated and complains about not being treated fairly by McCloskey because she's a woman. Shortly before what time period? Days before? Weeks before? Months before? I don't believe that it's clear in the record as to what the shortly is. It's clear that she goes to him more than once. She goes twice to HR. Once to Echols directly. And it's shortly before. And then the second time is days before. From your position, how long had the discriminatory treatment occurred? Was it of recent vintage or had it occurred over the years? I believe it would have occurred certainly over months, certainly since Hochstetter came to America. He had been there since the previous March. And so certainly for that year period, there had been the differential treatment, the favoritism toward the German male who ultimately was hired, not hired, but promoted to replace Ms. Sheinberg. In the same e-mail in which Mr. McCloskey made the decision to terminate her, he makes a statement to replace her with Hochstetter. Would you agree, counsel, that accusations of discrimination are a little weakened when they're made in the face of discipline? Not necessarily, and certainly not for summary judgment, Your Honor. I think that goes to the weight of the accusation and that she wasn't in the face of discipline. It's key to understand there was no warning. The e-mail addresses issues. There was never any previous warning as to the expense accounts issues in question. She had never been warned that she should take more care with her expense accounts? She had been talked to about the need to be more careful. There are e-mails regarding that issue. And we believe at summary judgment those are accurately characterized as coaching, not a warning. There is never any warning of subsequent discipline should she continue in the manner she had. Coaching goes on all the time. And at summary judgment we're entitled to one of the two reasonable inferences, that it was coaching as opposed to the second inference that they should be allowed to argue to the jury that it was a warning. But she was not ‑‑ there is no evidence that she was raising the issue of discrimination tied to any particular counseling. And if there were, at summary judgment that goes to the weight, not whether it's sufficient or not. I have two minutes left I'd like to save for rebuttal. All right. Thank you, Tim. Thank you. Good morning. May it please the Court, Tim Volpert for the defendants. My recollection of the record is that after Mr. Mikulski had turned down three suggestions that the plaintiff be terminated, that at a certain point when it was really getting rough, that is to say when the number of complaints about the plaintiff's performance were getting worse, she did talk to Eckhold. But I don't think the record indicates that she made discrimination accusations. I think she went to ‑‑ she talked to Mr. Eckhold about whether or not Mr. Eckhold or how she could better work with Mikulski after it became clear that she was having a difficult time working with everyone. When you say three suggestions that she be terminated, were those communicated to her? Was she aware of those? No, I'm not saying suggestions to be terminated. What I'm saying is that over a period of time, Your Honor, it became very clear, would become very clear to anyone that her job performance is inadequate. There's a whole long litany in our brief of things that were happening over the course of a year and a half, where things were building up, where Americans, American women, a whole array of people in the Adidas organization were questioning the plaintiff's expenses, were questioning the plaintiff's ‑‑ her travel, were questioning the samples she was buying, were questioning her favoritism. There's a period of time that we lay out on our brief relatively early on where several of her employees quit. They negotiated severance packages for them because they couldn't work with her. She was having ‑‑ she was ‑‑ I mean, it's fair to say, your first question I think is a good one. It's fair to say that she was not a good manager. She was a bad manager. She did not do a good job. She was not meeting the legitimate expectations of the employer virtually from the beginning. Now, early on, she got some reasonable reviews. But if you look at the chronology that we lay out on our brief, you will see that over time her performance was very poor. When she got the evaluation in November of 01, if you look at that evaluation, you see what she got. She did not get an evaluation. To say two on a scale of six, to say fair, is not, if you look at that scale, is not an example of meeting employment expectations. It's an example, if you look at what the scale says, it indicates that she was not meeting those expectations, that Adidas was hopeful she would meet them. But let's look at what happened after that. After the November 01 evaluation, you have the e-mail from Mr. Bennett to her, basically saying, if I may characterize, you're a manager, and you're pushing the outside of the envelope with these expense reports, and you're not attaching receipts, and you're not doing what you need to do, and that's not the way a manager operates. Now, you can call that a warning, which I think fairly is characterized, or you can call it coaching, but you have that in December. You have this presentation in February, which was, by all accounts, a disaster. It was an embarrassment, and DePlain admits that. You then have the trip they take, and you have the expense accounts submitted. Now, notice what happens with those expense accounts. This is not Mr. Mikulski or Mr. Eckhold or somebody jumping all over those expense reports that were submitted for the New York and Los Angeles trip. This was Glenn Bennett's assistant, who's an American woman, who looked at those expenses and said, this doesn't seem right. And she went out and did her own independent investigation, and she's the one that figured out that Cindy Scheinberg had signed an expense report where she said that she was trying to seek gym workout fees when she was buying cosmetics. And then, after that, you have the audit. And the audit comes back showing not just these two incidents, but a history of expense report problems. And so, to say, it is almost, I don't want to engage in hyperbole here, but it's almost inconceivable to say that on the day Adidas decided to terminate her, she was meeting Adidas's legitimate expectations. Now, the only thing that counsel raises is the comments by Eckhold in March. But I think what that says is there's nothing in what Mr. Eckhold said in March to indicate that he thought she was meeting legitimate expectations. A fair reading of that statement is, sure, we want to keep people in a position like this if we can help it. We've been over backwards. We don't want to try to replace someone in a position like this if we can help it. But Mr. Eckhold, certainly in March, did not say anything to indicate that he thought that the plaintiff was a good employee. So, it's virtually, it seems to me, I'll probably dribble this as I go. So, I think as low as the burden is in the prima facie case, I think the district court was right. There is absolutely no evidence that the plaintiff was meeting legitimate employment expectations. I think it's fair to say that virtually anyone in the position of Adidas would have terminated Ms. Scheinberg at that point. I want to clarify a couple of, oh, and second of all, of course, they have the second aspect of their burden of proof. Which is that they treated similarly situated people outside of the class differently, and you don't have any evidence of that either. There's no evidence, for instance, of treatment of other managers. There's no evidence that similarly situated German males were treated more favorably. In this instance, they have not met their prima facie case. Now, I want to clarify a couple of things. First, this allegation of defamation because of expensing the same meals. Well, they did expense the same meals. It's almost semantics. And I think you can see what was going on if you look at an exhibit which is at ER 222 in the record. And that exhibit basically shows that what was going on is they were both expensing two breakfasts each day. Then they were both expensing two lunches each day. So it was not that they were turning in duplicate receipts for the same meals, but they were both expensing breakfast twice, essentially. We talk about that in our brief, and I think you can see it most effectively at ER 222. It's also helpful to look at, at ER 224, the results of the audit. The results of the audit do not just talk about what happened during the New York City and the Los Angeles trip. The results of the audit go all the way back to August 9 of 2001. And you can go right down the line and see that on 11-11-01, both Cindy and Denise expensed breakfast for both. Cindy being the plaintiff. 11-12-01, Cindy expensed dinner, and Denise expensed evening business meal for both. 12-2-01 to 12-11, Cindy and Denise used different exchange rates for lodging. The point I'm trying to make is I won't go into great detail, but you have to look at what Mr. Eccles saw here. And I would submit to you that any reasonable person who looked at this litany of irregularities, culminating in Ms. Sheinberg signing that expense report, saying that she was charging gym workout fees when she was buying cosmetics, that anyone had a reasonable basis to believe that she was falsifying expense reports. Counsel, what is opposing counsel referencing when he says there was a finding that they were not expensing the same meals? This is kind of confusing. They are not both turning in an expense report for a meal at Denny's for the same meal. What they're doing is they're each turning in on a given day. The plaintiff and her companion, the plaintiff would turn in an expense report for breakfast for she and her companion. On that same day, her companion would turn in an expense report for breakfast for she and the plaintiff. Could be at a different place. Yes, could have been. And that's what's basically going on. And that's the thing that I think is best illustrated when you look at ER-222. I think it's also really helpful to look at the expense report itself, the expense report that was turned in. And I don't have the – I don't know that I have that in front of me, but we certainly cited it in our briefs. And, you know, it's not a long, detailed expense report with 100 items that, in all likelihood, the plaintiff would have overlooked when she tried to make Adidas pay for her cosmetics or when she tried to expense a Jaguar inconsistent with the policy. It's a relatively short expense report. It's got about six items on it. And the plaintiff says she reviewed it. And she certainly signed it. And for what it's worth, her signature is directly next to this entry that says that she's, you know, where she expenses gym workout fees when, in fact, they're expense reports. Excuse me, when, in fact, they are cosmetics. So you have to remember that when Mr. Eckhold was sitting there and saying that she'd engaged in expense report falsification, he knew that Glenn Bennett in December of 2001 had told her that, by gosh, she better be real careful with her expense reports. You're a manager. You have to be responsible. You have to set a standard. And he knew that she had reviewed and signed this form. And then he knew that many, many times there were irregularities in what was going on. I think it's difficult to make any reasonable argument that he did not have a genuine belief in the truth of what he said. There's a case I want to bring to the Court's attention. And it was cited in the plaintiff's opening brief, I believe. It is the Lund case, Oregon case, Lund v. Arbonne International, Inc. And I wanted to just bring it to your attention because it goes to the issue of what the plaintiff is required to prove when overcoming a privilege in a context like this. And you'll find at footnote 8 in that case, first of all, in the text the Court says, there was no evidence from which it could be found that defendants had no reasonable belief in the truth of the statements or that they acted with improper motive. There's a footnote. It says, to show that defendants lacked a reasonable belief in the truth of their statements, plaintiff had to offer evidence creating a question of fact as to the mental states of defendants at the time they made the statements. There's no evidence in the record that Mr. Echold had any mental state which would suggest that he was knowingly lying about the expense report falsification. The plaintiff's testimony is she doesn't accuse Mr. Echold of discriminating against her. The only person she accuses of discriminating against her is Mikulski. The plaintiff tries to suggest that somehow you have to assume that Mikulski wanted to replace the plaintiff with a man named Hostetler and that the Echold knew that Mikulski wanted to do that and therefore Echold had some motivation to falsify the expense reports. But there's no evidence for any of that. They're just asking you to make assumption on top of assumption. The case that they cite, if I want to add, that they cited as additional authority, Bonseca I think is the name of the case, does not change the general rule in the Ninth Circuit that with stray remarks there has to be proximity. In that case, the remarks the court made a point of pointing out that the comments that were made, the racial comments that were made, were made within a month or two of the hiring decision. In this case, there is absolutely no evidence as to when supposedly Mr. Mikulski called her a Jewish princess. There is evidence, however, and I think it's undisputed that he didn't do that until she called herself that. And let me see if there's anything else I want to add. We cited, Your Honor, as additional authority, Siegel v. Citadel Broadcasting, and it's a 2004 case in which the court held that circumstantial evidence of pretext must be specific and substantial. And I think counsel indicated that the court in that case suggested that really that shouldn't be the rule anymore after Costa, but it is, and I don't think that's fair characterization at all. I think the court recognized Costa. Costa's a different case. Costa talked about mixed motives and whether or not circumstantial evidence could be used in a mixed motive case. Costa did not talk about opposing counsel's position that all of that just goes to the weight of the evidence rather than crediting for purposes of granting summary judgment. I'm sorry, all of what? Whether or not the evidence is substantial, how substantial the evidence is, goes to the weight of the evidence rather than the inference should be given to the plaintiff at that juncture and just weight should be determined. Well, that's just not the law in the Ninth Circuit. When you're at the summary judgment stage and you're trying to rely on circumstantial evidence as evidence of pretext, it has to be substantial evidence. It's not a matter of weight. When you get to the jury, you see, you have to remember Costa is a case of a jury instruction, and they're talking about what you tell the jury about circumstantial evidence versus direct evidence, as I recall. And when you get to a jury, I think it's fair to say, okay, you give the jury the evidence and let the jury weigh the evidence. You don't make any comment on the evidence. This is different. This is the summary judgment stage, and I think it's pretty well established in the circuit that at that stage, if you're going to rely on circumstantial evidence, it has to be substantial. Submit to you that the only evidence in the record is the American Prince's comments. There's no nexus to the hiring decision, or excuse me, to the adverse decision. There's no context. She was never able to say when it was said, et cetera, et cetera. What about the evidence that opposing counsel articulated regarding the preference for German males and the anti-American remarks? I think as the district court found, Your Honor, that's vague, ambiguous, generalized statements. Largely found, I believe, in the Natal Declaration, which we would suggest to you that the district court should have stricken because of evidentiary failures. But they're just general statements. They're not picking anybody out specific, and they're not saying that given specific evidence of where any of that has occurred. It's more complaining, I think, is a fair characterization. I think that's the way the district court looked at it, and that's what I think if you look at the evidence, what you'll see. It's just generally grousing and saying, well, he's nicer to other Germans than he is to me. It's not specific enough evidence under these circumstances, and the district court found that and explained that in greater detail. I think everything else has been covered in the briefs, and unless there are additional questions, I'm finished. If he is, there are none. Thank you. Thank you. Rebuttal? The defendant makes a point of Mr. Mickelson having opposed terminating my client not once but three times. The most recent time was in that March meeting that I read you the language from, in which they decided they wanted to keep her. They definitely wanted to keep her. They decided to develop a work improvement plan, and three-and-a-half weeks later, she's terminated. And what has changed in that three-and-a-half weeks? Why not follow normal procedure and ask her what happened, correct a common mistake that happened in 10% of the expense reports, according to Ms. Thaler, 10% had errors, 5% had miscodings? Why not follow the practice that was followed according to Natel's testimony, according to plaintiff's testimony, and according to Hochstetter's testimony? The practice was to talk to the individual and find out what happened. The reason at summary judgment, the reason that they didn't follow that practice and leaped to the conclusion to terminate her after, instead of putting her on the work improvement plan, was that Hochstetter's employment was in jeopardy, and there is clear evidence that Mickelson favored Hochstetter as a German male. The defendants say that the statements regarding Germans and males, et cetera, were vague and ambiguous. There is nothing vague about naïve girl, the phrase used in the December evaluation four months, only four months before the termination. There is nothing vague or speculative about Jewish princess, used over 20 times, as well as princess. The conduct, in addition to those comments, shows evidence of discriminatory animus, and under Citadel, as well as what's left of Goodwin and Mustafa, that's sufficient. Thank you. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument today is Ross Simmons v. Weyerhaeuser. Thank you. Thank you.
judges: T.G. Nelson, Rawlinson, Pollak